IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | |  |
|---|---|---|
| **TAMEKA RICHEY BEST,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | CV-09-BE-02460-E |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of the Social** | ) | |
| **Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

**I.  INTRODUCTION**

On May 24, 2007, the claimant, Tameka Best, filed for disability insurance benefits under Title II and for supplemental security income benefits under Title XVI of the Social Security Act. (R. 94, 98).  The claimant alleged disability beginning February 15, 2004, because of seizures and high blood pressure. (R. 94, 120).  The Commissioner denied the claim both initially and on reconsideration.  The claimant filed a request for a hearing before an Administrative Law Judge, and the hearing was held on June 26, 2009. (R. 92).  In a decision issued on August 4, 2009, the ALJ found that the claimant was not disabled as defined by the Social Security Act and, thus, she was ineligible for both disability insurance benefits and supplemental security income. (R. 18). The Appeals Council denied review of the ALJ's decision on November 13, 2009, and the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1).  The claimant has exhausted all of her administrative remedies, and this court has

1

jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court affirms the decision of the Commissioner.

## II. ISSUE PRESENTED

Whether the ALJ improperly applied the pain standard in finding that the claimant's subjective statements concerning intensity, persistence and limiting effects of symptoms were not supported by objective medical evidence.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but must view the record in

its entirety and take account of the evidence that detracts from the evidence relied on by the ALJ.

*Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

## IV.  LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432 (d)(1)(A) (2004).  To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed;
> (2) Is the person's impairment severe;
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app.1;
> (4) Is the person unable to perform his or her former occupation;
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to finding a disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

A three part pain standard "applies when a claimant seeks to establish disability through his or her own testimony of pain or other subjective symptoms." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *see also Kelley v. Apfel*, 185 F.3d 1211, 1215 (11th Cir. 1999).  The pain standard requires evidence of an underlying medical condition and *either* objective medical evidence that confirms the severity of the alleged pain arising from that condition or that the objectively determined medical condition is of such a severity that it can be reasonably expected

3

to give rise to the alleged pain. *Holt*, 921 F.2d at 1223.

## V. FACTS

*Physical Limitations*

The claimant has a high school education and was thirty-one years old at the time of the administrative hearing. (R. 26). Her past work experience includes employment as a cashier at various businesses and restaurants, and as a temporary secretary. (R. 28, 108). The claimant alleges that she is currently unable to work because of frequent seizures and high blood pressure. (R. 120). The claimant appeals the ALJ's finding that the frequency of her seizures was not credible and that she can perform her previous work as a cashier.

Claimant suffered seizures as a child, but they stopped for a period of time until recurring in her late twenties. (R. 29). On April 30, 1997, claimant was admitted to Northeast Alabama Regional Medical Center for EEG and EKG testing after experiencing a seizure. (R. 178). The test resulted in a finding of sleep deprivation with "no definite epileptiform discharges." (R. 179). However, test results noted that the "parozysmal slowing can be compatible with intermittent cerebral dysfunction causing seizure disorder." (R. 179).

On March 28, 2007, ten years later, the claimant reported one grand mal seizure to her treating physician, Dr. Collins, M.D., an internist. (R. 248). Dr. Collins reported no examination findings of patient other than a headache. (R. 248). Claimant reported that in addition to the one grand mal seizure, she experienced two more seizures the day before she visited Dr. Collins. (R. 248). After starting new medication, claimant met with Dr. Collins once a month for recheck and reported no further seizures. No witness was present during the seizures. (R. 248).

On September 10, 2007, the DDS examiner, Ms. Hill, performed a physical residual

functional capacity assessment of the claimant.  In the assessment, Ms. Hill reported that claimant had no exertional limitations, no manipulative limitations, no visual limitations, and no communicative limitations.  Ms. Hill observed postural limitations when the claimant was climbing, stooping, kneeling, crouching, and crawling.  Ms. Hill also found that claimant's environmental limitations involved avoiding concentrated exposure to extreme cold, extreme heat, humidity, vibration, fumes, and hazards. (R. 218-221)  Ms. Hill concluded that "claimant's statements about symptoms and functional limitations are only partially credible as the severity alleged is partially consistent with the objective findings from the evidence in the file." (R. 222).

On December 20, 2007, claimant visited treating physician Dr. Rahim, M.D., a specialist in neurology, who recorded one reported seizure since her last visit in September 2007. (R. 294). The seizure was witnessed by claimant's husband, who described it as a "spell of confusion rather than a generalized tonic-clonic seizure." (R. 294).  Dr. Rahim noted that the claimant's last major generalized seizure occurred in May 2007.  Dr. Rahim also completed a seizure functional capacity questionnaire that the claimant's attorney provided. (R. 303).  Dr. Rahim reported that claimant's seizure duration was variable, lasting between one and three minutes, with exhaustion manifesting for thirty minutes to an hour after each seizure. (R. 304).  At the time, claimant had only experienced two seizures in 2007 and both could be linked to sleep deprivation. (R. 304). Dr. Rahim noted that claimant's reaction to medication caused lethargy and lack of alertness; therefore, claimant should not drive, and should avoid heights, water and certain tools. (R. 307). He noted that work with moderate stress would be fine and that her absence from work would be variable depending on when seizures occurred. (R. 306).

In a visit during March of 2008, Dr. Rahim noted that claimant alleged five small seizures

over the past three month period. (R. 291). During this visit, claimant did not complain of any side effects from her medicine. (R. 291) Her medication was modified to control the seizures and a recheck visit was scheduled. At the recheck in July of 2008, Dr. Rahim noted that claimant's seizures had been stable over the past six months, with a few minor spells. (R. 288). He continued medication and gave precautionary advice with a recheck scheduled. In January 2009, claimant reported that she had experienced one nocturnal seizure one month prior to the visit. (R. 285). Dr. Rahim noted that claimant admitted a failure to take one of the prescribed medications because of finances. (R. 285).

  Claimant admitted herself to NE Alabama Regional Medical Center in March of 2009 after a reported seizure lasting three minutes. (R. 262). Claimant reported that her only post seizure symptom was sleepiness, but that she had come to the medical center after medics encouraged her to seek treatment. Laboratory results showed a low level of phenytoin within a few hours of the seizure, indicating a lack of seizure controlling drugs in her system. (R. 271).

  In April of 2009, Dr. Rahim completed another seizure residual functional capacity questionnaire that the claimant's attorney provided. (R. 298). Dr. Rahim reported that claimant's seizures occurred approximately once per month, but they were variable. (R. 298) He listed her last three seizures on the report occurred in May 200[8], June 2008, and December 2008. (R. 298). Post seizure symptoms of confusion, exhaustion, and muscle strain were recorded as lasting one to two hours. (R. 299) Dr. Rahim then noted that the "patient has to have bed rest for ten to twelve hours." (R. 299). Dr. Rahim also reported that claimant was compliant with taking medication, but then later noted, "patient misses her seizure medication for financial reasons." (R. 300). He opined that claimant could work in moderate stress environments, that

she would need one or two short breaks each day, and he anticipated that the claimant may be absent from work three times per month because of seizures. (R. 300).  Dr. Rahim noted that the claimant's problem paying for one of the prescribed medicines had been resolved through prescription for the generic form of the drug and assistance from a drug program. (R. 300).

Claimant completed two seizure logs for her attorney alleging ten seizures between December 2007 and March 2008 (R. 157) and seven seizures between January 2009 and April 2009. (R. 313).  There was no seizure log to indicate seizure frequency for the time period of April 2008 through December 2008.  In another seizure log, claimant reported that she experienced thirteen seizures between May 2009 and December 2009.  The claimant provided no additional evidence to verify the accuracy of the seizure logs, and the seizure logs did not indicate if claimant filled them out at one time from memory or as the seizures occurred.

*ALJ Hearing*

After the Commissioner denied the claimant's request for supplemental security income, the claimant requested and received a hearing before an ALJ. (R. 5).  At the hearing, the ALJ listened to testimony from the claimant, claimant's husband, and a vocational expert.  Claimant stated that she was currently thirty one years old, and that her highest education was the twelfth grade. (R. 26).  She testified that she had worked several jobs as a cashier in the past but was currently unemployed. (R. 27-29).  Claimant also stated that although she had seizures as a child, they stopped until recurring in her late twenties. (R. 30).

When describing her seizures, claimant stated that she becomes unaware of her surroundings and shakes all over. (R. 31).  She claimed that she has experienced three to four seizures a month for the past three years. (R. 31).  Claimant denied knowing how long her

seizures lasted but stated that they occur both day and night. (R. 31). She testified that after a seizure, she feels tired and sleepy. (R. 31). She further testified that she takes her medications as the doctor prescribes them. (R. 31). Although she has a valid driver's license, claimant stated that she has not driven in three to four years. (R. 32).

When questioned about daily activities, claimant described that her mother-in-law cleans, cooks, does laundry, and helps with the two children while claimant's husband is away at work. (R. 34). Claimant stated that she reads, listens to the radio, and naps all day. (R. 33). Claimant does not engage in social activities since her seizures returned. (R. 35). In an average month, claimant stated that she would leave the house approximately three times to go to the grocery store, Wal-Mart, church, and the doctor. (R. 36). Claimant described that she requires two to three days after every seizure to recover. (R. 40). However, claimant stated that, even on regular days, she cannot function normally because she is tired and sluggish at all times. (R. 41).

Claimant's husband testified that he and the claimant have been married for eleven years. (R. 43). He currently works construction jobs and is gone for most of the day, but he has witnessed his wife have a seizure. (R. 44). He opined that the claimant experiences "at least three" seizures per month. (R. 44). He also testified that his wife had been experiencing three to four seizures a month throughout their entire eleven year marriage. (R. 44). When questioned about her most recent seizures, Mr. Best stated that the last one he observed was two weeks prior to the hearing, and the one prior to that was about a month prior to the hearing. (R. 46). He also testified that she sleeps for three to four hours after a seizure, but does not recover to normal functioning level until a couple of days after the seizure.

Lastly, the ALJ questioned vocational expert, Dr. Robert Griffin. Griffin opined that

claimant could perform past relevant work even with her seizure disorder as long as she never climbs ropes, ladders or scaffolds. He noted no exertional limitations, but he listed environmental limitations, including avoiding concentrated exposure to extreme heat and cold, humidity, vibration, fumes and other airborne pollution, hazardous machinery, and unprotected heights. He further limited the claimant from driving. (R. 49). The ALJ questioned Griffin as to whether a person in the claimant's position could maintain a job with three to four absences a month. Griffin opined that if the claimant was absent from work three to four times a month because of seizures, she could not perform past relevant work or any other work that exists in the national economy. (R. 49).

*ALJ Decision*

In a decision dated August 4, 2009, the ALJ found the claimant not disabled. (R. 19). The ALJ found that the claimant had not engaged in substantial gainful activity since May 17, 2007. (R. 12). The ALJ determined that the claimant's seizure disorder was a severe impairment because it caused more than a minimal impact on her ability to perform work. (R. 13). The ALJ further found that none of the claimant's impairments taken individually or in combination met the Listing of Impairments. (R. 13).

The ALJ concluded that the claimant retained the residual functional capacity (RFC) to perform a full range of work at all exertional levels. She established the following limits: claimant must never drive or climb ropes/ladders/scaffolds and must avoid all hazards. She further limited the claimant to avoiding concentrated exposure to heat, cold, humidity as well as air pollutants. (R. 13).

In making the finding, the ALJ followed the pain standard analysis process in which she

first determined whether any underlying medically determinable physical or mental impairments could reasonably be expected to produce the claimant's symptoms. The ALJ noted the claimant's history of seizure disorder. Claimant's primary diagnosis of seizure was first noted in September of 2007 by a state agency physician. (R. 13).

Second, the ALJ evaluated the intensity, persistence and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic work activities. The ALJ determined that the testimony of claimant and her husband were not substantiated by objective medical evidence, and the claimant's allegations of seizure frequency were not credible.

In making this determination, the ALJ considered all of the evidence and medical records submitted along with the claimant's testimony at the hearing. The ALJ found numerous discrepancies among the claimant's self-reporting in the seizure logs, claimant's testimony, and the medical records. (R. 16). Therefore, the ALJ found the claimant's statements as to the frequency of seizures not to be credible.

Further, the ALJ found inconsistency in the amount of recovery time the claimant needs after experiencing a seizure. In a questionnaire completed by the claimant, she stated that she experienced weakness for only a day or two, but at the hearing she stated that she was weak for three to four days after a seizure and groggy all other days. (R. 16). Also, the claimant originally indicated on a questionnaire no side effects from medication, but at the hearing, claimant alleged that her medications make her too drowsy to function normally. The ALJ additionally noted some indication in the record that non-compliance with medication coincides with her seizures.

The ALJ concluded, after consideration of all evidence, that the claimant's medically

determinable impairment could easily cause the alleged symptoms, but the claimant's statements concerning intensity, persistence and limiting effects of these symptoms were not credible. (R. 17). Referring to the vocational expert's opinion, the ALJ found that the claimant could perform past relevant work. Therefore, the ALJ concluded that the claimant was not disabled as defined by the Social Security Act. (R. 18).

## VI. DISCUSSION

Claimant argues that the ALJ should have given the claimant's testimony at the hearing full credibility. Specifically, claimant contends that the ALJ did not properly consider her testimony that she experienced three to four seizures per month. Given the vocational expert's opinion that absenteeism from work three to four times a month would not allow the claimant to maintain employment, the disability determination hinged upon whether the ALJ accepted or rejected the credibility of claimant's subjective testimony about the frequency of the seizures.

The pain standard "applies when a claimant seeks to establish disability through his or her own testimony of pain or other subjective symptoms." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *see also Kelley v. Apfel*, 185 F.3d 1211, 1215 (11th Cir. 1999). The pain standard requires (1) evidence of an underlying medical condition *and* (2) *either* (a) objective medical evidence that confirms the severity of the alleged pain arising from that condition *or* (b) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain. *Holt*, 921 F.2d at 1223.

In the instant case, the ALJ found that claimant met part one of the standard, presenting evidence of a seizure disorder, an underlying medically determinable impairment. Whether her seizure disorder could reasonably be expected to disable her from employment depended upon

11

the frequency and intensity of her seizures and the severity of her condition. When applying the second part of the pain standard, however, the ALJ found that a discrepancy existed between the objective medical evidence presented and claimant's testimony about the frequency of her seizures and the severity of that condition. Thus, he found that the objective medical evidence did not confirm claimant's testimony about the severity of her condition and that her testimony was not otherwise credible.

In making a credibility finding, the ALJ "need not totally accept or totally reject the individual's statements" and "may find all, only some, or none of an individuals's allegations to be credible...or credible to a certain degree." (SSR Rul. 96-7p, 1996 4-5). When the ALJ fails to credit a claimant's subjective pain testimony, or doctors' reports evidencing an underlying medical condition, he must articulate reasons for that decision. *See Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991). Substantial evidence must support the articulated reasons. *Hale v. Bowen*, 831 F.2d 1007, 1012 (11th Cir. 1987). Furthermore, the ALJ cannot reject a claimant's testimony based solely on his or her own observations or on criteria that are unsubstantiated by objective medical evidence. *Johns v. Bowen*, 821 F.2d 551, 556-7 (11th Cir. 1987).

Tthe ALJ noted discrepancies between the objective medical records and the subjective testimony of the claimant and her husband throughout the opinion. The ALJ specifically noted that the claimant's reports and testimony of seizure frequency did not correspond with her treating physician's records. The record reflects significantly fewer seizures. The claimant's personal seizure logs allege ten seizures in three months between December 2007 and March 2008, but Dr. Rahim listed only five seizures over the past three month period during a March 2008 checkup. The frequency of seizures in the logs does not correspond with the frequency her

treating physician reported. Even the high frequency of seizures in the seizure logs, if credible, do not meet the criteria of Listing 11.02 nor 11.03. The frequency of seizures in the most recent seizure log was between one and two small seizures per month, which does not meet the listing criteria.

During the hearing, the testimony of the claimant and her husband was inconsistent as to the frequency of seizures. The claimant testified that her seizures returned three years ago, occurring three to four times per month. The claimant's husband testified that she experienced three to four seizures per month during the entire course of their eleven year marriage. The ALJ clearly articulated that this inconsistency was cause for concern as to the credibility of the claimant and her husband. Also, Dr. Rahim's records are inconsistent as to the frequency of seizures. In a questionnaire, Dr. Rahim noted that claimant experienced one seizure per month but the dates of claimant's last seizures in his notes indicated that she experienced one seizure every four to five months.

Additionally, the claimant's testimony of recovery time was inconsistent with the claimant's self-reported records and medical questionnaires submitted in evidence. The claimant expressed in a questionnaire that she experienced weakness for a day or two after a seizure, but at the hearing, the claimant stated that she could not function normally on any given day because she had either just had a seizure, was weak for three to four days following a seizure, or was groggy from medication all other days. Dr. Rahim's notes indicated that claimant's seizure recovery time requires bed rest for up to twelve hours, but her post seizure manifestations of confusion, exhaustion and muscle strain only last for one to two hours. Dr. Rahim's opinion was different in a prior report, where claimant expressed that postical manifestations last only thirty

13

minutes to an hour.

At the hearing, the claimant testified that she must take her medication to control the seizures, but even when the seizures are controlled, the medicine's effects make her too sleepy and groggy to function normally.  However, the claimant stated in questionnaires to the state agency that she did not experience side effects from the medication.  The ALJ noted that the medications listed on the questionnaire were identical to the ones she was taking during the hearing, with the exception of Keppra.  Further, Dr. Rahim's notes did not indicate any major side effects from the medication other than one report that listed lack of alertness and lethargy as mild side effects.

The ALJ also found "at least some indication in the record that non-compliance may be an issue." (R. 17).  Claimant's hospital visit resulted in a test that found low levels of seizure controlling medication.  The ALJ found evidence in the record that the claimant's failure to take her medication coincided with the seizure.  Because this seizure was one of the claimant's first in some time, the ALJ reasoned that if the medication were properly taken, fewer seizures would occur, and three to four absences a month because of seizures would be unlikely.

The ALJ examined the credibility of the claimant's testimony regarding her limitations because of seizures in light of her testimony as to her activities of daily living.  In a 2007 form, claimant reported that she was responsible for household duties, taking care of her children, and that she had learned to cope with her condition.  However, at the hearing, the claimant stated that she was not capable of any household chores, taking care of her children, social activities, or daily tasks.  Objective medical records do not support any change in her seizure frequency between 2007 and the hearing.  The ALJ found that the claimant's testimony of daily activities

14

during the hearing was not credible because the claimant had the opportunity to report an increase in seizures to her doctor during her regular visits. The medical records do not reflect any such reports of increased frequency to her treating physician.

The claimant's statements and allegations of daily activities are also inconsistent with the residual functional capacity assessment. The assessment, completed in 2007, found the claimant to have no exertional limitations and the following postural limitations: no climbing ladders/ropes/scaffolds and a few environmental limitations. The vocational expert opined at the hearing that the claimant was fully capable of performing her past relevant work. The ALJ found his opinion to be very persuasive and his determination to be consistent with the record as a whole.

During the hearing, the ALJ also asked the vocational expert if the claimant would be able to maintain a job with an absentee rate of three to four times a month. The vocational expert answered that no employer would tolerate so many absences. However, the ALJ found no need for the claimant to be absent three to four times a month, because her medical records reflect far less than one seizure occurring per month. The claimant's seizure recovery time is questionable, but according to medical records, recovery time should be no more than a day or two of rest. The claimant's testimony and self-reporting allege far more seizures than the medical record; however, without objective medical evidence to support the claimant's allegations, the ALJ must evaluate the credibility of such statements based on a consideration of the entire case record. In this case, the ALJ found that the record did not contain objective medical evidence to support claimant's testimony and thus, her subjective testimony about the frequency of her seizures did not meet the requirements of the pain standard.

The ALJ did not fail to consider the vocational expert's opinion, as claimant has alleged. Rather, the ALJ found the opinion inapplicable to the claimant. If the claimant only has a few seizures a year, as her medical records reflect, she should not be absent from work three to four times a month. The inconsistency between claimant's self-reporting, medical records, testimony, and husband's testimony gave the ALJ reason to doubt the credibility of the claimant as to seizure frequency. The ALJ properly articulated reasoning for her determination of credibility.

## VII.  CONCLUSION

For the reasons stated above, substantial evidence supported the ALJ's decision. The court concludes that the decision of the Commissioner should be AFFIRMED. The court will enter a separate order consistent with this opinion.

Dated this 29th day of October, 2010.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE